KELLEY v. PARR.

FRAUD—ACCOUNTING—EVIDENCE—SUFFICIENCY.

On a bill by stockholders of a corporation against the general manager, a capitalist who financed the operations, and a company which purchased assets of the corporation, charging bad faith and responsibility for its losses, the conclusion of the court below that plaintiffs had failed by proper proof to maintain their charges, *held,* supported by the record.

Appeal from Grand Traverse; Mayne, J. Submitted April 25, 1919. (Docket No. 45.) Decided October 6, 1919.

Bill by Walter N. Kelley and another against William W. Parr and others for an accounting. From the decree rendered, plaintiffs appeal. Affirmed.

*Parm C. Gilbert,* for plaintiffs.

*Hawley & Eldred,* for defendants.

KUHN, J. This is a bill for an accounting, filed by two of the stockholders of the South Side Company, of Traverse City, against William W. Parr, the general manager of the company, Thad B. Preston, who had financed the corporation under an agreement whereby he held its stock in trust as security, with a certain supervision over its management, and the Brown Lumber Company, which had come into possession of certain of the assets of the South Side Company after the latter ceased operations.

In the year 1909, a prior corporation, known as the South Side Lumber Company, of Traverse City, was insolvent and in the hands of a receiver. Plaintiff Kelley and defendant Parr had been stockholders in this corporation and connected with its management.

In the summer of 1909, Kelley, Parr and others organized a new corporation, under the name of the South Side Company, to take over the assets of the insolvent company, and this new corporation entered into the following agreements with defendant Preston for the furnishing of money and credit to it by said Preston, viz.:

"Memorandum of agreement, made and entered into this 20th day of July, A. D. 1909, between the South Side Company, a corporation of Traverse City, Michigan, and T. B. Preston, of Ionia, Michigan.

"Witnesseth, that whereas, the first party has this day entered into an agreement with John F. Ott, The Traverse City Iron Works and James Cameron, wherein and whereby it is provided and mutually agreed between the parties that in case the said Ott, The Traverse City Iron Works and Cameron purchase upon their bid of eighty-two thousand dollars ($82,000) the properties of the South Side Lumber Company now being advertised for sale by J. O. Crotser, receiver, upon said bid, and the court allows the said second party hereto the sum of four thousand dollars ($4,000) for attorney fees, costs and expenses, then and in that case the said first party to this agreement will pay to the said Ott, The Traverse City Iron Works and Cameron, or to the receiver, the said sum of eighty-two thousand dollars ($82,000) cash for said property as of April 1, 1909, and

"For that, whereas, the said first party hereto require, for the purpose of carrying out its agreement with Ott and others a large sum of money, which it desires said second party to this agreement to furnish to it,

"Therefore, it is mutually agreed as follows:

"*First.* The said second party agrees to furnish the money necessary, to wit: The sum of eighty-two thousand dollars ($82,000), with which said first party shall pay the purchase price of said properties, provided the same is struck off to said Ott and others, and said sale is confirmed by the court, and title thereto is transferred to said first party hereto, upon the following conditions:

"(a) That the court allows the said second party four thousand dollars ($4,000) for attorneys fees,

costs and expenses in the matter of a bid made by said second party for said property, which said bid and the confirmation thereof, was set aside by the court, for the purpose of accepting the bid of said Ott and others, at the sum of eighty-two thousand dollars ($82,000).

"(*b*) That said first party execute and deliver to said second party its promissory notes for the sum of twenty-eight thousand dollars ($28,000), or such other sum as said second party is required to pay for said property, over and above the sum of fifty thousand dollars ($50,000), to be paid and secured as hereinafter provided, which said notes shall become due and payable as follows:

"Five thousand dollars ($5,000) October 15, 1909; five thousand dollars ($5,000) December 15, 1909; five thousand dollars ($5,000) August 15, 1910; five thousand dollars ($5,000) September 15, 1910; five thousand dollars ($5,000) October 15, 1910; five thousand dollars ($5,000) December 15, 1910; provided the amount of thirty thousand dollars ($30,000) is required; and provided further, that whatever sum is required upon settlement with the receiver, over and above said sum of fifty thousand dollars ($50,000), then, and in that case, the said first party shall give to said second party its promissory notes or the cash, which said notes shall be due and payable as above provided, in an amount equal to the amount due said second party; and all shall be paid on or before the 15th day of December, 1910, with interest at the rate of six (6) per cent. semi-annually.

"(*c*) The first party shall also execute and deliver to said second party a mortgage securing bonds to the amount of fifty thousand dollars ($50,000), which shall be due and payable as follows:

"Five thousand dollars ($5,000) August 15, 1911; five thousand dollars ($5,000) September 15, 1911; five thousand dollars ($5,000) October 15, 1911; five thousand dollars ($5,000) December 15, 1911; five thousand dollars ($5,000) August 15, 1912; five thousand dollars ($5,000) September 15, 1912; five thousand dollars ($5,000) October 15, 1912; five thousand dollars ($5,000) December 15, 1912; five thousand dollars ($5,000) August 15, 1913; and five thousand dollars ($5,000) September 15, 1913, which said bonds

shall bear interest at the rate of six (6) per cent. semi-annually.

"(*d*) The said first party shall also execute and deliver to said second party its promissory notes as follows:

"Five thousand dollars ($5,000) October 15, 1913; five thousand dollars ($5,000) due December 15, 1913; five thousand dollars ($5,000) August 15, 1914; five thousand dollars ($5,000) October 15, 1914, bearing six (6) per cent. interest, payable semi-annually.

"*Second*. The said second party hereto agrees to furnish the said first party a line of credit to the extent of twenty-five thousand dollars ($25,000), said line of credit, however, and the cash furnished, not to exceed the sum of seventy-five thousand dollars ($75,-000), in the aggregate, at any one time.

"*Third*. The said first party shall pay to said second party in cash, all such sums as may be due and payable for accumulated interest upon any moneys which said second party has had in his hands for the purpose of carrying out the former contract in relation to the purchase of said properties, and upon certified checks deposited or otherwise, and will also save harmless the second party from any and all damages, losses or expenses which he may be to in any way from the fact of depositing with the First National Bank of Traverse City and the Peoples Savings Bank of Traverse City, two certified checks under certain conditions, for the purpose of purchasing the claims of said banks against the said South Side Lumber Company. Said second party agreeing, however, that he will not at any time pay to said banks anything upon said checks in settlement or otherwise, except upon the written consent of the said first party hereto.

"In witness whereof, the parties hereto have set their hands and seals the day and year first above written.

"SOUTH SIDE COMPANY,
"WALTER N. KELLEY, President. (L. S.)
"T. B. PRESTON." (L. S.)

"Memorandum of agreement, made and entered into by and between the South Side Company, a corporation, of Traverse City, Mich., and Thad B. Preston, of Ionia, Mich., witnesseth,

"Whereas, the second party has advanced certain moneys for the purpose of paying the purchase price of the properties now owned by the South Side Company and purchased of J. C. Crotser, receiver for the South Side Lumber Company, with the understanding that the stock of the said South Side Co. should be issued in trust to the said Preston and held by him as collateral security for the fulfillment of all obligations of payment made by the South Side Co. to the said Preston and to the Union Trust Co., as trustee, therefore it is mutually agreed between the parties hereto, and the president and secretary of the said South Side Co. are to issue to said Preston the certificate of stock for forty-nine thousand nine hundred and fifty dollars ($49,950), as trustee; said stock to be held by said Preston until all obligations of said South Side Co. are fully paid to him and to the bondholders under the bond mortgage this day executed and delivered to the Union Trust Co., and when all of such obligations and indebtedness is paid and satisfied in full, said Preston agrees to surrender said stock, and thereupon the president and secretary of said company shall cancel said certificate and issue certificates to the following parties:

| | |
|---|---:|
| W. N. Kelley | $25,500 |
| W. W. Parr | 9,000 |
| Mary E. Lowell | 2,500 |
| M. G. Vivian | 500 |
| E. L. Montague | 500 |
| Ralph Case | 1,000 |
| J. O. Crotser | 1,000 |
| Treasury | 9,950 |

"SOUTH SIDE CO.,
"By WALTER N. KELLEY.
"THAD B. PRESTON.

"September 13th, 1909."

The promissory notes provided for in subdivision (d) of the first paragraph of the above agreement of July 29, 1909 (aggregating $20,000), represented the agreed compensation of Mr. Preston. For some additional assistance later rendered, this amount was increased to $22,500.

The bond issue of $50,000 contemplated by subdivision (c) of said paragraph was arranged through the Union Trust Company, and the bonds were sold with Mr. Preston's guaranty or indorsement.

A Mr. J. J. Corcoran was appointed by Mr. Preston to represent him in the company and was made treasurer. He countersigned checks, approved purchases, and watched the conduct of the business, but took no active part in its management.

The operations of the South Side Company resulted in loss. In February, 1912, its planing mill at Traverse City burned. It was fully covered by insurance, which was collected, but the affairs of the company were then in such condition that it did not seem advisable to rebuild, and from that time the efforts of the management were directed to winding up the affairs of the company so as to save, if possible, something for the stockholders. The company, however, proved to be insolvent.

Plaintiff Kelley was the president of the company, and at the outset was in charge of its logging and lumbering operations. Later, Mr. Preston, being dissatisfied with the results obtained, insisted on the removal of Mr. Kelley and the substitution of Mr. Parr as general manager. The latter remained in charge to the end.

Plaintiffs' case, briefly stated, is this: It had been the custom of the company to issue financial statements from time to time, copies of which were furnished to plaintiff Kelley. In June, 1912 (after the fire), the following statement was issued:

"Statement (June 1, 1912).

South Side Company, Traverse City, Mich.

Assets.

Cash—

| | |
|---|---|
| Interest fund ......................... | $50.00 |
| Grand Rapids Natl. City Bank.......... | 1,234.61 |
| First Natl. Bank, pay roll ............. | 100.00 |
| Notes receivable ...................... | 721.62 |

Accounts receivable—
 Customers ............................... $17,575.02
 Sundry debtors ......................... 730.27
Prepaid expenses at Trav. City........... 481.28
Inventories—
 Wholesale lumber .............. $7,883.08
 Retail lumber .................. 2,206.21
 Retail lath ..................... 109.52
 Retail shingles ................. 404.83
 Doors and windows ............ 1,374.35
 Posts and columns ............ 191.17
 Box factory lumber ............ 798.03
 Carp. shop material ............ 1,718.25   14,685.44
Steubenville box factory account .......... 4,871.23
Plant, Traverse City—
 Real estate ............................ 4,550.00
 Furniture and fixtures .................. 402.33
 Horses, wagons and harness ............ 763.30
Tula timber ............................. 14,597.01
Tula cutover lands ........................ 5,000.00
Tula investment .......................... 3,720.61
McManus contract ........................ 23,472.81
Investment at Hiawatha—
 Current cash .................. $31.67
 Prepaid expenses .............. 1,675.70
 1910 lumber ................... 478.56
 1911 lumber ................... 7,735.87
 1912 lumber ................... 20,935.81
 Old shingles .................. 193.40
 Old posts and poles ............ 16.25
 Equipment .................... 2,667.89
 Timber ................. ...... 4,633.51   38,368.66
Contract with W. W. Parr ................ 625.87
            ————————
            $131,950.06

      Liabilities.
Mortgage bonds .......................... $10,000.00
Land contracts payable ................... 11,144.38
Accrued interest on land contracts.......... 255.00
Notes, payable .......................... 47,725.62
Accrued interest on notes payable.......... 667.80
Accounts payable ........................ 14,618.97
Reserve for bad debts .................... 304.38
Hiawatha logs ........................... 2,767.91

| | |
|---|---:|
| Capital stock ............................. | $50,000.00 |
| Loss and gain this year, Trav. City........ | 2,837.63 |
| Loss and gain this year, Hiawatha......... | 3,050.10 |
| Loss and gain previous years at Trav. City.. | 19,159.89 |
| Loss and gain previous years at Hiawatha.. | 24,906.36 |
| | $131,950.06" |

To the above detailed inventories were appended. About a year later Mr. Kelley was furnished with the following statement:

| | "June 6, 1913. | |
|---|---:|---:|
| | 5/10/13 | 5/10/13 |
| | Assets | Liabilities |
| Cash ............................. | $39.60 | |
| Notes receivable ................. | 461.42 | |
| Accounts receivable .............. | 18,325.76 | |
| Tula Lumber Company .......... | 19,339.95 | |
| Geo. Henderson contract ......... | 100.00 | |
| Bark at Tula ................... | 2,000.00 | |
| Note payable .... ................ | | $39,500.00 |
| Accounts payable .......... .... | | 2,224.39 |
| | $40,266.73 | $41,744.39" |

It is plaintiffs' claim (1) that no substantial loss could have occurred subsequent to June, 1912, because the company's operations ceased at about the time of the fire in February, 1912; and that inasmuch as the June, 1912, statement, after making gain and loss adjustments, shows the capital stock unimpaired, while the statement of June, 1913, shows an entire disappearance of the capital fund, with liabilities in excess of assets, there must have been in the meantime a dissipation of the property of the corporation entirely unaccounted for.

(2) That if defendants claim the losses occurred at Tula and Hiawatha, defendants Parr and Preston should be held personally responsible for these losses for mismanagement. That, among other things, defendant Parr, after assuming the management, had released one McManus from a logging contract under

which the Tula operations could have been conducted at a profit to the company, and entered into a new arrangement with him which resulted in a heavy loss to the company.

(3) That the following checks, drawn by the company to defendant Parr, are wholly unaccounted for, viz.:

"Jan. 16, 1910, Check No. 567.................  $1,958.45
Aug. 31, 1910, Check No. 1048................  2,460.27
Feb. 7, 1911,  Check No. 1396................:.  1,436.10
Aug. 12, 1911, Check No. 1724................  2,206.10
May 8, 1912,   Check No. 1726................  3,117.27
                                              _____
                                              $11,178.19"

(4) That the Brown Lumber Company, in which Mr. Preston and Mr. Parr were the principal stockholders, had come into possession of certain of the assets of the South Side Company, particularly a working contract, known as the "Durant-Dort contract," and other lines of business properly belonging to the South Side Company and its stockholders.

(5) That Mr. Parr continued to draw a salary of $250 per month, fixed by his employment contract, after the company had ceased operations, and that he claimed his salary in full during the entire term of the contract.

Plaintiffs ask for an accounting of these matters; that Mr. Parr and Mr. Preston be charged personally with the losses at Tula and Hiawatha; that Mr. Parr repay to the company the amount of the checks paid to him and unaccounted for; that the Brown Lumber Company account to the South Side Company for the contracts and property taken over; that the salary of Mr. Parr cease as of June 1, 1912; and that the defendants account to the stockholders for the net value of the South Side Company as per statement of June 1, 1912.

207—Mich.—20.

In reply, defendants submit a more complete statement of facts, which, in the main, seems to be well substantiated by the record, and which is not questioned or denied by any reply brief on the part of the plaintiffs. The matters involved were gone into fully on the hearing in the lower court, there being nearly 500 pages of testimony in the printed record, besides voluminous exhibits. Such of the facts as serve to answer the plaintiffs' charges follow.

An addition of the column headed "liabilities" in the statement of June 1, 1912, will show that the total is incorrectly given as $131,950.06, and that it should be $187,438.04. The "assets" column is correctly added. Had the two columns balanced, as they purported to do, the gain and loss items would have indicated profits. As it is, it is doubtful what they were intended to show. Counsel seem to take it they represent losses. If so, the statement would show the capital fund more than exhausted at that date. Eliminating these items, the liabilities would still exceed the assets, and the value of the capital stock would appear on the face of the statement to have then been only $44,466.00. The statement, however, carries as assets the amounts invested in the Tula operations and a portion at least of the actual investment at Hiawatha. The testimony of the accountant shows most convincingly that there was a loss of upwards of $26,000 at each of these places. These losses, though for the most part sustained prior to the date of the statement, had not then been fully ascertained, nor had proper entries been made on the books to indicate same. It is clear, therefore, that the statement cannot be given the interpretation and weight that plaintiffs claim for it. Mr. Becker, the accountant selected by the plaintiffs to go over the books and papers of the company and make a transcript and report thereon, testified as follows:

"So far as the entries in the books are concerned and the transactions there recorded, there is nothing irregular about the books in any way. The books and records are all complete as far as there is any records. There is a debit and credit for each transaction. * * *

"*Q.* Then you take, Mr. Becker, the accounts we have with Tula and Hiawatha and you find from the books of the company that there was a material loss to the company because of those operations, didn't you?

"*A.* Yes, sir. I gained some evidence as to when this loss occurred and have undertaken to show when that occurred. * * *

"*Q.* Are you able to give from your statement the amount of the loss at Hiawatha, the total amount, for all the operations there I mean now?

"*A.* I think I am, yes.

"*Q.* Well, just give us that.

"*A.* The total loss at Hiawatha, on the whole, was $24,518.84. In addition to the above are the accounts, insurance, taxes and railroad.

"*Q.* Yes, isn't it a fact that that should be added to the loss of that operation?

"*A.* That may be possible; I don't know if there is any income from those accounts. If these were added it would bring the loss up to the figures shown here, that I made, showing the loss at Hiawatha at $26,573.04. My statement also shows a loss at Tula and that loss was $26,119.19. * * *

"*Q.* Well, you have determined the amount of the loss at the two places?

"*A.* Yes, the Tula and Hiawatha from the books and tickets, $52,693.03, I think that is the amount. * * *

"*Q.* As I understand it, witness, you did this: You took the aggregate of what was actually spent, say at Tula—

"*A.* Yes. * * *

"*Q.* Including the sales, railroad and everything?

"*A.* Yes, sir.

"*Q.* And you found that they had expended at Tula this $26,000 and some dollars more than they had gotten?

"*A.* Yes, sir.

"*Q.* And that is where you got your loss?

"*A.* Yes, sir, that is the idea."

Bearing on the question of mismanagement, and responsibility for same, the following facts appear:

Besides the planing mill, real estate and stock of lumber at Traverse City, the property purchased from the receiver consisted of a few contracts for the sale of planing mill products; also sawmill, logging outfits, camps and equipment at Hiawatha, Schoolcraft county; and a contract for the purchase of 1,080 acres of timber land at Tula, Gogebic county, on which latter there was unpaid, when turned over by the receiver, about $22,000, of which the company then paid $5,000, the balance remaining an obligation against the lands and against Mr. Preston personally. At the outset, plaintiff Kelley, the president of the corporation, was given charge of the logging and lumbering operations in the Upper Peninsula, and Mr. Parr was put in charge of the office and the Traverse City plant.

In the fall of 1909, plaintiff Kelley went to Hiawatha, and, after looking over the ground, made the following report to Mr. Preston:

(South Side Company Letterhead.)
                    "Hiawatha, Mich., Nov. 5th, 1909.
"T. B. Preston,
    "Ionia, Mich.

"*Dear Sir:* Have been here this week and have covered the situation very thoroughly and everything is progressing very satisfactory and from present indications we are going to get our logs in at a less cost than we figured on. The weather has been very favorable and we have a good class of laborers and we are getting the timber on skids at a very reasonable cost. If we have a favorable winter this will enable us to get the logs in at less than we expected and the quality of timber is better than what we have cut here during the past two years. We are figuring on putting in and manufacturing about five million feet of lumber here this coming season that will be made up about as follows:

White pine ............................. 200,000 ft.
Norway pine ........................... 1,000,000 ft.
Hemlock ............................... 500,000 ft.
Hardwood ..................... .......... 3,000,000 ft.
Cedar shingles ......................... 7,000,000 ft.

"It will cost us about the following amount to camp us until May 1st, 1910:

Logging ................................ $25,350.00
Manufacturing to May 1st................ 6,000.00
General expense ........................ 2,500.00
Hauling lumber ......................... 2,250.00
Hauling shingles ....................... 700.00
                                         _____
To May 1st ............................. $36,800.00

"We have $19,184.23 of lumber and shingles on hand here so that we will need to get from Traverse City end about $............to carry this operation through.

"Very truly,
"WALTER N. KELLEY."

Operations were begun, and in January, 1910, Mr. Kelley reported the situation as follows:

"South Side Company,
"Manufacturers, Wholesale and Retail Dealers.
"HIAWATHA, MICH., January 29th, 1910.
"T. B. PRESTON,
"Ionia, Mich.
"Dear Sir: This operation is in good shape, the logging is in fine condition. We have our full amount of logs cut and about one-half of them hauled. The winter conditions could not have been much better had we ordered it, the snow is quite deep but not so as to make it bad or expensive logging. Everything has been very favorable and we will be able to get our logs in at the estimated cost, and as the lumber prices are improving in all probability we will be able to make a better showing than the figures I gave you. Our mill has not got down to business yet. My calculation was based on cost of manufacturing, $3, but it has cost us $3.24 up to date, but we must get this cost down below the $3.00 mark and there is no reason why we can't. We will have all our logs into the mill

yard by March 10th. We have cut the following amount of logs up to January 22d.

January 22nd scales of logs.

| | |
|---|---:|
| Norway pine | 1,006,294 ft. |
| White pine | 224,939 ft. |
| Spruce | 251,600 ft. |
| Balsam | 198,400 ft. |
| Tamarack | 325,000 ft. |
| Hemlock | 438,168 ft. |
| Hard maple | 1,436,277 ft. |
| Beech | 123,629 ft. |
| Birch | 191,422 ft. |
| Cedar | 470,413 ft. |
| Total | 4,666,142 ft. |

"Have cut enough to make full five million since above date.

"We have on hand here of last year's dry lumber the following:

| | | |
|---|---|---:|
| 1,278,492 ft. | value | $17,092.31 |
| Shingles, 2,535 M. | value | 4,373.55 |
| | | $21,565.86 |

"We are now hauling this out and will be able to get it all out within the next sixty days. It will require the following amount of money to carry us until May 1st:

| | |
|---|---:|
| For logging | $5,000.00 |
| For manufacturing lumber | 4,500.00 |
| For shingles | 2,280.00 |
| For hauling lumber and shingles | 2,500.00 |
| For general expenses | 500.00 |
| | $14,780.00 |

"Will be required at the following dates:

| | |
|---|---:|
| March 15th | $6,760.00 |
| April 15th | 4,760.00 |
| May 15th | 3,260.00 |
| | $14,780.00 |

"The pay roll for February 15th amounts to $7,-800.00, at which time it will be necessary to use our full line to clean up the payment, interest and pay roll, and you will notice that we will be in shape to take care of ourselves in nice shape by moving our lumber and shingles as there is $21,465.86 to pay $14,-780.00 with. We have orders on our books to take this lumber just as fast as we can ship it.

"Hoping that everything is satisfactory to you,

"I am yours truly,

"WALTER N. KELLEY."

It appears from the testimony that, as a matter of fact, the logs referred to in the above letter were not scaled at all, but merely estimated; that the estimate was 4,200,000 feet instead of 5,000,000, and that the lumber that was shipped to the company therefrom amounted to only 3,903,700 feet, when it should have overrun the log scale. In the spring of 1910, plaintiff began the construction of a 3-mile spur track into the mill at Hiawatha, estimating the cost, in his report to the company or Mr. Preston, as about $1,000 per mile. The actual cost proved to be $6,000, the grading and ties having cost about $4,000 and the railroad company's bill for laying ties and iron being $2,000. Mr. Kelley also reported that he had 2,000,000 feet of lumber for shipment to the W. E. Williams Company, at Traverse City. There proved to be but 1,-200,000 feet. When this fact was discovered, Mr. Preston at once ordered Mr. Parr to go to Hiawatha and look the stock over. He found 1,000 cords of wood which was worthless, there being no market for it; that the shingles on hand were less than the estimated amount and of poor quality; that the lumber fell short of plaintiff's estimate by many thousand feet; that the Norway and white pine were badly stained and damaged; that some 40,000 feet of hardwood logs and 150,000 feet of softwood logs had been left in the woods over summer, with the result that the worms had spoiled the pine logs and the hardwood had be-

come dozy and would make only cull lumber. In the fall of 1910, Mr. Kelley proposed commencing lumbering operations at Tula. Mr. Parr objected on account of lack of funds and doubtfulness of the results. Mr. Preston, having advanced the entire amount agreed under the contract, had stated that he would not furnish any more money. Mr. Kelley, however, appealed to him, representing that $3,000 would be sufficient to put the operations at Tula where they would take care of themselves, and Mr. Preston finally agreed to advance from $3,000 to $5,000 for that purpose. It appears that the receiver of the old South Side Lumber Company had entered into a contract with Foster & Ayers (subsequently known as the Tula Lumber Company) to manufacture the logs at Tula into lumber and other products, and this contract was assumed by the South Side Company upon taking over the assets. Foster & Ayers, in reliance upon the contract, had constructed a mill at Tula to carry out this contract. Upon Mr. Kelley's recommendation, a contract was entered into by the South Side Company with one Isaac Lurya for the purchase by him of the lumber manufactured at Tula, in which contract Mr. Lurya agreed to advance certain sums of money each month for lumber cut during the previous months, and the company by said contract became bound to sell the lumber to him, Mr. Preston guaranteeing performance by the company. Mr. Kelley also hired one Blue to manage the operations at Tula. After Mr. Blue had expended about $2,500 with little apparent result, Mr. Kelley discharged him and entered into a contract with one George McManus, to do the work at a certain fixed price. Mr. Kelley himself spent only four days a month at Hiawatha and Tula during the entire period of his management of these operations. In February, 1911, because of the unsatisfactory situation at both Hiawatha and Tula and other

alleged instances of poor management on plaintiff's part, Mr. Parr became dissatisfied, tendered his resignation as an officer and manager of the company, and notified Mr. Preston and the company that he would take with him what were known as the "Steubenville" or "Pope Tinplate" contract and the "Durant-Dort" contract, which he claimed to control personally, and which were the South Side Company's most valuable assets. Mr. Preston thereupon sent for Mr. Parr, Mr. Corcoran and plaintiff Kelley to meet him at Ionia. Plaintiff claims he did not get any such notice. At any rate he reached Ionia the day after Mr. Parr and Mr. Corcoran were there, and found that he had been removed as manager of the logging and lumbering operations, and that Mr. Parr had been put in full charge, the following contract having been made with him:

"The South Side Company, manufacturers, wholesale and retail dealers in lumber, lath, shingles, doors, mouldings, box shooks, 515 Lake Ave.   Tel. Bell 390; Citz. 308.

"TRAVERSE CITY, MICH., February 16th, 1911
"Contract for Service.

"This contract, entered into between the South Side Company, a corporation doing business in Traverse City, Michigan, party of the first part, and William W. Parr, resident of Traverse City, Mich., party of the second part.

"The party of the first part agrees to hire, and does hire, the said W. W. Parr, party of the second part, as general manager of the South Side Company for the period of time that T. B. Preston is financially interested in said company, at an annual salary of three thousand dollars ($3,000), payable two hundred fifty dollars ($250) per month.

"THE SOUTH SIDE COMPANY,
"By J. J. CORCORAN, Treas.
"G. E. MCMICHAEL, Sec.
(Signed)     "W. W. PARR, party of the second part."

It appears that the season was very unfavorable

for the logging operations at Tula, and Mr. McManus soon found that he could not carry out his contract without heavy loss to himself, and accordingly refused to proceed with the work. Upon investigation, Mr. Parr found that he was financially irresponsible and that the company would have no remedy against him. He was a very competent man for the work. The company being under contract for the output of lumber and for the manufacture of the logs into lumber, and Mr. Preston having become personally liable for the carrying out of these contracts, it was impossible to avoid a loss by discontinuing the logging operations. Mr. Parr, therefore, hired Mr. McManus, at $75 a month, to superintend the work, and continued the operations at Tula, the result of which proved to be a heavy loss to the company.

The "Steubenville contract," above referred to, also known as the "Pope Tinplate Company contract," was a very profitable one. The contract was first made in 1906 between Mr. Parr (then with the South Side Lumber Company) and Mr. Hannen, the manager of the Pope Tinplate Company, but no boxes were manufactured until 1907. In October, 1907, the South Side Lumber Company failed, but the receiver continued the contract during his receivership, through Mr. Parr, whom he retained, and who controlled the contract, which was renewed from year to year. The benefit of this contract passed to the South Side Company upon their purchase of the assets. At the time of the making of the original contract between Mr. Hannen and Mr. Parr it was verbally agreed that Mr. Hannen should receive one-half of the net profits on the business done under the contract after the South Side Company had taken a profit of $1.50 per thousand on each thousand feet of lumber used in the manufacture of the tin-plate boxes. In consideration thereof Mr. Hannen was to oversee the manufacture

of the boxes at Steubenville, Ohio, and keep a faithful account of the number of boxes made and thereby relieve the South Side Company from the expense of employing and keeping a man at Steubenville to care for its interests. Under this agreement the money was to be paid by Parr to Hannen in cash and no record kept. This verbal agreement with Mr. Hannen was called to the attention of the circuit judge during the receivership of the South Side Lumber Company and was approved and ordered to be complied with by said court. It was also understood by Mr. Kelley, Mr. Parr and Mr. Corcoran and was thoroughly discussed at the time that Mr. Kelley and Mr. Parr were endeavoring to enlist the services of Mr. Preston in the affairs of the company. No receipts were taken from Mr. Hannen at the time the payments were made to him, but during the trial Mr. Parr obtained from him, and introduced in evidence, the following:

"STEUBENVILLE, OHIO, Nov. 6, 1914.
"Received from W. W. Parr in total eleven thousand one hundred seventy-eight dollars and eighteen cents ($11,178.18), my due as per verbal agreement, to look after the manufacture of tinplate boxes at Steubenville, Ohio, for the South Side Lumber Company.
(Signed)     "GEORGE W. HANNEN."

Immediately after the planing mill fire, Mr. Parr tried to rent the W. E. Williams plant at Traverse City in order to carry out the "Steubenville" and "Durant-Dort" contracts, but the Williams people refused to rent it. After some further efforts to hold these contracts, Mr. Parr finally turned them over to the Brown Lumber Company, which in the meantime had been acquired by Mr. Preston and himself. Its plant not being equipped for that kind of work, it became necessary for the Brown Lumber Company, at some expense, to enlarge and further equip its plant for that purpose, and new contracts were thereupon

made by the Steubenville concern and the Durant-Dort people with the Brown Lumber Company.

On June 1, 1912, the lumber and most of the personal property of the South Side Company remaining at Traverse City after the fire were purchased by the Brown Lumber Company, the sale being made on the basis of the prices shown by the January inventory, $15,448.74. It is the claim of defendant Parr that plaintiff was fully advised of this transaction and consented to same—in fact, that he was the first to suggest that it be done. Plaintiff admits that he asked Mr. Parr why the Brown Lumber Company didn't buy up this property, but denies that he was fully informed of, or consented to, this sale.

In the winter of 1912-1913 the Brown Lumber Company purchased logs at Hiawatha, and the South Side Company gave to one Eckstrom the use of the mill there for paying the taxes and keeping the mill in, repair. The taxes amounted to some $350, being not only upon the mill, but upon a considerable quantity of real estate, the taxes on which the South Side Company was obligated to pay until 1917. Early in 1914 the mill was sold to Mr. Eckstrom for $1,000, which the testimony indicates was a good price therefor.

In November, 1912, the Tula Lumber Company bought the timber at Tula from the South Side Company. This, with the foregoing sales, practically closed out and disposed of all the property of the South Side Company. It is the claim of the defendants that the company is insolvent, without sufficient money or property to cover its remaining indebtedness. It appears that Mr. McManus has brought suit against the company, claiming some $11,000, and that the receivers of the Pere Marquette Railway Company have also commenced a suit for $966.86, levying an attachment upon the remaining real estate of the company—a barn and fifteen lots at Traverse City, as-

sessed at $2,500. Mr. Preston has been paid in full, but may incur some loss in connection with debts of the company. He testified:

"At any rate, I have been paid the original $50,000 represented by these bonds, or repaid that amount with the interest accruing; I have been paid whatever is represented by those notes to make up this purchase price, and I have been paid notes representing my bonus, $22,500."

And again:

"*Q.* Are you in any way obligated because of the debts of the company?

"*A.* I am obligated to McManus of Frankfort, the one who took the contract up at Tula, or worked for us up at Tula."

After a full hearing, the circuit judge filed a written opinion, in which, after stating certain facts, he concludes as follows:

"I have carefully examined the testimony and cannot find any evidence that would justify me in holding defendants responsible for the loss at Tula and Hiawatha. In my opinion the parties were mistaken in the possibilities of the proposition. These lands were formerly before the court in the case of the South Side Lumber Co. and the court advised by experienced operators that a heavy loss would likely result from operating them. This opinion was one of the reasons why the receiver recommended a sale of the lands. This fact may not be material, yet it explains and justified the actions of the receiver. The fact that there was a loss is not sufficient to hold the defendants responsible. Their responsibility for it has not been shown.

"The transfer of the remaining assets to the Brown Lumber Co. presents a different question. The affairs of the company had to be closed and the property sold. The testimony is conflicting upon the question of the consent of plaintiff to the transfer. I do not find that any property was transferred at less than others would have paid for it. If defendants' action was detrimental to plaintiff's rights, the testimony fails to show wherein better results could have

been reached had a different course been pursued. His loss, if any, is not so itemized that the court can point out wherein plaintiff was injured. I find no evidence from which I can determine the amount of damage, if any, sustained by plaintiff.

"Defendant Parr was employed to manage the business of the company at a salary of $3,000 per year and was to stay as long as Mr. Preston was interested in the company.

"Mr. Parr claims he is entitled to his services up to the present time at the rate of $3,000 per year. My opinion is that at the time of the conclusion of the business at Tula and Hiawatha, which business at these points was finally closed about the first of January, 1915, that Mr. Parr should receive full pay up to January 1st, 1915, and as he has had more or less business of the company to look after since that time, he should be paid for his services what they were worth, and in my opinion $100 per month since January 1, 1915, would be a reasonable and fair compensation for his services. Plaintiff not to be charged with this amount. Decree may be settled upon notice."

From the decree entered in accordance with this opinion, plaintiffs have appealed.

A reading of the record is satisfying to us that the plaintiffs have failed by proper proof to show any evidence of bad faith on the part of the defendants in their dealings with reference to the matters here involved, and we are therefore of the opinion that there is no merit in the claims of the appealing plaintiffs and that the conclusion of the learned trial judge was a just and equitable one, considering all the facts in the case, which have been set up above at some length so that the claims of the various parties might be understood. His decree will therefore be affirmed, with costs to the defendants.

MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred. BIRD, C. J., did not sit.

The late Justice OSTRANDER took no part in this decision.